# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DIANE MARIE GROTH,                    *

    Plaintiff                         *

    v.                                *                    CIVIL NO. JKB-16-2569

PAUL M. NAKASONE,                     *
Director, National Security Agency,
    Defendant                         *

   *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

This is an employment discrimination dispute. Pro se plaintiff Diane Marie Groth sued her former employer, the National Security Agency[1] ("NSA"), alleging sex discrimination, age discrimination, and retaliation, pursuant to Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967 ("ADEA"). This Court stayed proceedings until the Equal Employment Opportunity Commission ("EEOC") could resolve Groth's appeal of some of those claims. The EEOC finalized the appeal, and the NSA renewed its motion to dismiss or, alternatively, for summary judgment. Groth opposes the motion and moves for leave to file a surreply. For the following reasons, NSA's motion for summary judgment will be granted, and Groth's motion for leave to file a surreply will be denied.

## I.  Background

### A. Administrative Proceedings

Groth first initiated her investigation into charges of discrimination in July 2009. Since that time, Groth has filed various formal charges with the NSA's Equal Employment Opportunity

---

[1]  Groth names General Paul M. Nakasone (previously, Admiral Michael Rogers) as the defendant, as she is required to do in a suit brought pursuant to Title VII. *See* U.S.C. § 2000e-16(c). Because "official capacity" suits are treated as suits against the government agency, *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985), the Court will refer to the defendant as the NSA.

and Diversity Office ("EEOD"), alleging harassment, discrimination, and retaliation. (NSA Exh. 1, Acceptance of Compl. No. 10-006; NSA Exh. 5, Acceptance of Compl. Nos. 11-029, 11-011. 12-004.)[2] These charges were adjudicated on the merits by administrative judges, who found no harassment, discrimination, or retaliation. (NSA Exh. 2, Decision No. 10-006; NSA Exh. 7, Order Entering Judgment Nos. 11-011, 12-004.) The NSA's EEOD adopted the findings. (NSA Exh. 3, Final Order No. 10-006; NSA Exh. 6, Final Order Nos. 11-011, 12-004.) Groth appealed to the EEOC, which affirmed the findings. (NSA Exh. 4, EEOC Decision No. 10-006; NSA Exh. 8, EEOC Decision Nos. 11-011, 12-004.)

In July 2016, Groth filed a civil complaint in this Court. (Compl., ECF No. 1.)

## B. The Court's Prior Ruling

The NSA previously moved to dismiss or, in the alternative, moved for summary judgment. (Mot. Dismiss & M.S.J., ECF No. 14.) This Court ruled on that motion in June 2017. (Memo. Op., ECF No. 18.) The Court held that Groth had exhausted her administrative remedies and timely filed her civil complaint. (*Id.* at 6.) Pertinent here, the Court also held that, in keeping with its mandate to construe pro se complaints liberally, the complaint—which only alleged sexual harassment as reviewed in Agency Action 10-006—encompassed all three of Groth's administrative cases, including Agency Action 11-011 and Agency Action 12-004. (*Id.* at 6.) The Court denied all other arguments without prejudice, staying the proceedings until the EEOC could finalize one of Groth's pending appeals. That ruling addressed subject matter jurisdiction and timeliness but did not address the merits-based arguments brought pursuant to Federal Rules of Civil Procedure 12(b)(6) or 56. The Court turns to those arguments for the first time now.

---

[2]      The NSA did not file its exhibits electronically due to their length. (Not. of Filing of Lengthy Exh., ECF No. 36-4.) Groth also filed her exhibits with the Court. Thus, there are no electronic filing numbers for the exhibits currently before the Court.

### C. Facts Derived from Administrative Record

Groth is a woman. She was born in 1953. (Groth Exh. 1, Not. of Personnel Action.) From March 2008 until February 2012, Groth worked as a Grade 15 Information Systems Security Engineer ("ISSE") for the NSA. (*Id.*) According to Carol H., the IT Security Chief of Groth's Division, TS1, "ISSEs are responsible for capturing and refining information protection requirements to ensure their integration into information systems acquisition and information systems development through purposeful security design or configuration." (NSA Exh. 9, Interrogs. at 3.) During her employment, Groth was one of two female civilian ISSEs. (*Id.* at 7.)

Groth was hired as a probationary employee for her first two years. (NSA Exh. 9, Interrogs. at 4.) As a Grade 15 ISSE, Groth was expected to "hit the ground running"; "to perform and deliver results, with no supervision"; and "to work high level tasks, hard tasks." (NSA Exh. 10, 4/5/12 Tr. at 428.) Over the four years, Groth had several supervisors who evaluated her performance. The supervisors gave her specific feedback in the form of performance evaluations. As early as the end of Groth's first year, Carol H. noted that Groth was not performing at the level of a Grade 15 ISSE. (NSA Exh. 9, Interrogs. at 3.)

Groth initially met expectations. During her first six months, one supervisor, Pamela T., concluded that Groth exceeded objectives and deserved a rating of 3.6. (NSA Exh. 21, Eval. at 262.) Groth received particularly high marks for her technical and professional development. (*Id.* at 261.) Pamela T. noted that "Groth enthusiastically pursued skill enhancement opportunities." (*Id.*)

In November 2008, one of Groth's supervisors, Bruce P., assigned Groth to work on the Security Tools Project. (NSA Exh. 10, 4/4/12 Tr. at 223.) Six to eight weeks after assigning the project, Bruce P. became concerned with Groth's progress. (*Id.* at 225.) Even though Bruce P.

had assigned Groth as the only ISSE on the project, she was recruiting other engineers to do her tasks. (*Id.* at 226.) Groth repeatedly failed to provide Bruce P. with the list of tools he had requested or to explain why she could not do so. (*Id.*) Bruce P. removed Groth from the project. (*Id.* at 227.) In December 2008, Bruce P. met with Groth to explain her removal. (*Id.* at 227–29.) At the meeting, Groth asked to be put back on the project and given a group of engineers for her to supervise. (*Id.*) Bruce P. explained to her that she, like the other engineers, did not hold a supervisory position. (*Id.*) Even without the Security Tools Project, Groth was assigned to twelve to fifteen other projects throughout her employment. (*Id.* at 238.)

In January 2009, Bruce P. drafted a counseling letter to inform Groth that her performance and conduct were unsatisfactory. (NSA Exh. 9, Memo. of Record at 43.) The letter cited specific failures and instances of misconduct. Among other things, Groth misrepresented the government and insulted an agency contractor; she enlisted other engineers to create PowerPoint slides then failed to deliver those slides in time for the presentation; and, she failed to submit her Annual Contribution Evaluation ("ACE") plan. (*Id.*) Bruce P. chose not to send the letter in January, but when Groth's performance did not improve by July, Bruce P. held a counseling session with her to address her continued performance issues. (*Id.* at 41–49.)

Within her first year, Groth became interested in an agency-funded fellowship and scholarship program. The program was full-time, requiring employees to be out of the office five days a week to pursue their graduate degrees. (NSA Exh. 10, 4/4/12 Tr. at 242.) Bruce P. refused to support Groth's application because she was still in her probationary period and he needed her at work full-time so that he could evaluate her work product. (*Id.* at 242–43.) In May 2009, Groth applied anyway, requesting an endorsement from Carol H. without mentioning that her direct supervisor had declined to endorse the application. (NSA Exh. 9, Interrogs. at 3.) When Carol H.

and her manager, Martha M., discovered that Bruce P. had not supported Groth's application, Martha M. cancelled the endorsement. (*Id.* at 13.) Martha M. testified that she would not have supported anyone in the two-year probationary period applying to the program. (NSA Exh. 10, 4/5/12 Tr. at 467.) No one else in TS1 applied. (*Id.*)

Groth's application to the fellowship program convinced Carol H. that Groth was failing to follow the chain of command and intentionally misleading her supervisors. (NSA Exh. 9, Interrogs. at 3.) Two months later, Groth received counseling regarding her bypass of the chain of command and her generally unsatisfactory performance for a Grade 15 ISSE. (NSA Exh. 11, July 2, 2009 Counseling Session.) Bruce P. met with Groth to discuss performance deficiencies and expectations. (*Id.*) In August 2009, Bruce P. did authorize Groth to participate in after-hours courses, and the NSA paid for the courses. (NSA Exh. 12, Authorization.) Bruce P. emphasized that Groth should do all after-hours coursework "during non-duty hours." (NSA Exh. 26, 8/3/09 Memo. for the Record.)

Groth received an annual performance evaluation rating of 2.5 out of 5, or minimally successful.[3] (NSA Exh. 21, 10/1/08–7/31/09 ACE at 255.) Bruce P. noted that Groth needed to improve in all performance aspects: accountability, communication, critical thinking, technical expertise, engagement and collaboration, and personal leadership and integrity. (*Id.* at 253–54.) Groth argued that Bruce P. removed accomplishments from her review. Carol H. responded that supervisors are supposed to edit their employees' submissions and that Bruce P. "deleted parts that were exaggerated or didn't apply to the particular objective." (NSA Exh. 9, Interrogs. at 17.) Bruce P. testified that he omitted information from other employees' evaluations as well: "If the

---

[3]     Carol H. stated, "[Groth] would have a much lower ACE score if her immediate supervisor had all of the appropriate paperwork in place to support a lower score. However, based on ACE rules, without all the processes being followed, 1's can't be given." (NSA Exh. 9, Interrogs. at 10.)

information cannot be validated, if I question the integrity of it, in other words, I felt that there was some stretching of the truth, and I didn't get anything to help me validate it I would omit it in that case." (NSA Exh. 10, 4/4/12 Tr. at 263.)

In the evaluation, Bruce P. stated that Groth "has not demonstrated the technical expertise expected commensurate with her grade level." (NSA Exh. 21, 10/1/08–7/31/09 ACE at 254.) As one example, Bruce P. pointed out that Groth failed the Certified Information System Security Professional ("CISSP") test, (id.), a certification required by the Department of Defense for all Grade 15 ISSEs, (NSA Exh. 24, 6/1/10–1/31/11 ACE). The company that administers the test initially notified Groth that she passed and sent her a corresponding certificate. (Groth Exh. 10, Certification.) The company then regraded the exams and found that Groth had failed. (Groth Exh. 10, 9/16/14 Tr. at 57; NSA Exh. 20, Dawn H. Decl. at 443.) Groth asserts that the company discriminated against her, re-grading the exams so that men passed, and women failed, but she has put forward no evidence in support of that claim. The company offered Groth "the opportunity to retake the exam at no charge," (Groth Exh. 10, ISC Ltr.), but Groth never rescheduled.

Shortly after receiving this rating, Groth was asked to step down as co-chair of an Employee Resource Group ("ERG"). ERG groups are sponsored by the EEOD Directorate to "[m]odel, foster, and communicate the vision, values, goals, and objectives of the EEOD Strategic Plan." (NSA Exh. 13, ERG Charter.) The groups comprise diverse individuals and promote the interests of that group. (NSA Exh. 10, 4/5/12 Tr. at 437.) Groth asked Bruce P. if she could join the women's group, and he encouraged it. (NSA Exh. 10, 4/4/12 Tr. at 234–35.) Bruce P. testified that he and Groth agreed that she would participate on a "non-interfering" basis because he needed her "here as much as possible to do [her] work." (Id. at 235.) At first, Bruce P. allowed her some time during the work day to participate in the women's group. (Id.)

Groth became the group's co-chair. Groth's supervisors noticed that, as a result, Groth started to lose engagement with some of her engineering projects. (*Id.* at 236.) Bruce P. found that Groth was "away from her duties quite frequently" and told her that she could only do women's group activities outside of work hours. (NSA Exh. 9, Interrogs. at 8.) Carol H. testified that Groth's leadership role in the women's group was impacting Groth's ability to "do the mission that she was hired to do," which was "to perform security engineering." (NSA Exh. 10, 4/5/12 Tr. at 438.) Carol H. asked that the EEOD remove Groth as co-chair because she was performing poorly. (*Id.* at 438–39.) Carol H. asked Groth "to stop all outside activities (other than ISSE work) until she improved her ACE score to at least a 3.0." (NSA Exh. 9, Interrogs. at 9.) Groth disputes that the women's group interfered with her work and testifies that, when Bruce P. asked her to step down from the women's group, she said, "Do you have more work for me, because I don't have enough work to do?" (Groth Exh. 5, 4/4/12 Tr. at 39.)

Groth began investigating whether she was being discriminated against in 2009. On July 6, she filed an informal investigation with the NSA's EEOD. (NSA Exh. 1, Acceptance of Compl. No. 10-006.) Subsequently, she filed a formal complaint. (*Id.*) Around the same time, in June 2009, the other female working civilian ISSE was promoted to Grade 14. (NSA Exh. 9, Interrogs. at 7.) Carol H. added, "[Groth] was one of only 2 female working ISSEs, the other successful." (*Id.*)

Groth's ACE score did rise. When Bruce P. evaluated Groth again in November 2009, he gave her an overall ACE score of 2.7, a successful rating. (NSA Exh. 21, 10/1/09–11/13/09 ACE at 248.) Bruce P. explained that, although Groth did not perform well, she did improve in the areas of engagement, collaboration, and accountability for results. (*Id.* at 247.) Bruce P. also credited her for successful contributions to the women's group, as was reflected in her score. (*Id.*) Around

this time, at the end of 2009, Groth began to seek out other job placements in the federal government. (*See* NSA Exh. 9, Interrogs. at 4, 12; NSA Exh. 18, 10/17/10 Email re Job; NSA Exh. 19, John D. Decl. at 2.)

In January 2010, Groth did not receive a performance bonus. Bonuses are tied to the ACE score. (NSA Exh. 14, Martha M. Decl. at 2.) Martha M., the Chief Information Security Officer for the NSA at Fort Meade stated, "Only 50 percent of the organization can receive a bonus and [Groth] was not in the top 50 percent." (*Id.*) Groth was not even eligible for a bonus because, in January 2010, her most recent ACE rating was 2.5, below the minimum successful rating of 2.6. (NSA Exh. 15, Carol H. Decl. at 3.) Groth did succeed in passing out of her probationary period, (Groth Exh. IV.2), and received a pay increase within her Grade for performing "at an acceptable level of competence," (*id.*). At the same time, Groth's supervisor, John D., wrote in a memorandum that Groth was failing to meet expectations and, recently, had failed to attend a meeting at which multiple organizations showed up to review her projects. (NSA Exh. 27, 4/30/10 Memo for the Record.) It is unclear whether Groth received this memorandum.

In May 2010, John D. evaluated Groth for her work the previous year, giving her the rating of 3 out of 5 in each category but elaborating that "she fails to meet expectations."[4] (NSA Exh. 21, 11/13/09–5/31/10 ACE at 238.) John D. specified that Groth struggled with communication: "She has received counseling letters and memos to the aforementioned, has failed to appear for directed and scheduled meetings, and has created numerous incidents which have caused unnecessary burden and added labor of effort primarily due to her failures in communications." (*Id.* at 239.) In terms of qualifications, Groth continued to lack the certifications required for a

---

[4]      Her overall rating was a 2.7 initially. (NSA Exh. 14, Martha M. Decl. at 1.) Groth's supervisor, John D., failed to provide proper documentation and feedback to Groth throughout the year to justify that rating. (*Id.* at 2.) Upon reconsideration, the rating was raised to 3. (*Id.*)

Grade 15 ISSE, and "she does not understand the business process and fails to grasp the basics that ISSEs are being asked to follow." (*Id.*) In addition, John D. thought that "her leadership and integrity have room for improvement." (*Id.*)

Groth received both positive and negative feedback from her customers. On occasion, Groth received emails from clients praising her work. (*See* Groth Exh. 4, 4/12/10 Email re Appreciation for Diane Groth; Groth Exh. 4, 4/8/10 Email re ISSE Assistance Request; Groth Exh. 4, 9/5/08 Email re meeting info; Groth Exh. IV, 1/13/12 Email re Thank you; Groth Exh. IV, 3/28/11 Email re CARILLON.) By contrast, Bruce P. testified that he received negative feedback from customers about Groth's work. (NSA Exh. 10, 4/4/12 Tr. at 258–59.)

In January 2011, Dawn H. reviewed Groth's performance. (NSA Exh. 24, 6/1/10–1/31/11 ACE.) Dawn H. made note of some technical shortcomings: e.g., that Groth still did not have the CISSP certification; that Groth did not understand some systems that are foundational to all ISSE work; and that Groth did not contribute her technical expertise or comments to a process document that was the basis for employee workflow. (*Id.* at 8.) Dawn H. added that Groth "has had at least one office outburst and multiple occasions where she does not respond to e-mails." (*Id.*)

In June 2011, Groth was assigned a "Documented Plan for Improved Performance" ("DPIP"), which required Groth to attend weekly meetings. (NSA Exh. 15, Carol H. Decl. at 3.) The DPIP was put in effect for thirty days to improve Groth's performance to a successful level. (NSA Exh. 25, DPIP Letter.) Groth was informed that, if her performance remained at minimally successful or unacceptable, she could be subjected to adverse effects, including termination. (*Id.*) The DPIP letter listed essential milestones, (*id.*) one of which was scheduling another CISSP test, (NSA Exh. 22, 9/17/14 Tr. at 241). Groth did not reschedule the test. (*Id.* at 244.) Groth did not attend at least two of her weekly DPIP meetings. (*Id.* at 252.) At one meeting, Carol H. recalls

that Groth asked, "why won't you just let me leave?" (NSA Exh. 15, Carol H. Decl. at 4.) Carol H. responded that Groth could leave TS1 by finding another NSA job or by leaving the NSA entirely. (*Id.*) Even during the DPIP, the NSA continued to invest in Groth's performance. The NSA sponsored Groth to attend a conference in California "because provided [she completed] a successful DPIP, it was critical to where we were going from a technology perspective and for her to understand the technology." (*Id.* at 236–237.) John D. explained, "I was expecting a successful DPIP." (*Id.* at 237.) Groth ultimately failed her DPIP. (NSA Exh. 22, 9/17/14 Tr. at 245.)

Groth's final performance evaluation spanned June 2010 to July 2011. (NSA Exh. 29, Performance Eval.) Dawn H. gave Groth an overall rating of 1 out of 5 or unacceptable. (*Id.*) Carol H. testified that, over the course of Groth's four years with the NSA, Carol H. attended at least two dozen meeting about Groth's performance. (NSA Exh. 10, 4/5/12 Tr. at 436.) On December 14, 2011, Groth received a "Notice of Proposed Action" to remove her from the agency's employment for unacceptable work performance. (NSA Exh. 30, 12/14/11 Ltr.) On February 9, 2012, NSA terminated Groth's employment. (Groth Exh. 12, 1/24/12 Ltr.)

## II.    Analysis

Based on this administrative record, the Court discerns the following claims: (1) age and sex discrimination under a theory of disparate treatment; (2) hostile working environment; and (3) retaliation. The NSA moves to dismiss each claim pursuant to Rule 12(b)(6) or for summary judgment pursuant to Rule 56. (Mot. Dismiss & M.S.J., ECF No. 36.) Groth opposes the NSA's motion and moves for leave to file a surreply. (Mot. to File Surreply, ECF No. 43.)

### A. Standard of Review

The NSA and Groth have attached extensive exhibits from the administrative record. The Court may consider that record only if it construes the NSA's motion as a motion for summary

judgment pursuant to Rule 12(d). Rule 12(d) requires that all parties receive a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Groth had notice that the NSA would move for summary judgment because the NSA had already so moved before this Court stayed proceedings. Indeed, Groth does not request further discovery but, rather, attaches her own collection of exhibits. Because the Court finds that the parties had a reasonable opportunity to obtain and present pertinent materials, the Court concludes that consideration of the NSA's motion for summary judgment is proper.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The moving party bears the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the non-moving party, then a genuine dispute of material fact exists, and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But, the "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient. *Id.* at 252. The non-moving party may not rest upon the pleadings but instead must, by evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Where a genuine dispute exists, the facts and inferences derived therefrom must be viewed in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2009).

In this case, it is the NSA's burden to show that it is entitled to judgment as a matter of law, but Groth has the burden of persuasion in establishing her discrimination claims. This means

11

that the Court views the evidence in the light most favorable to Groth, but Groth still must present enough evidence to show that there is a genuine issue of material fact for trial.

## B. Title VII and ADEA Claims

Title VII and the ADEA make it unlawful for an employer, including the federal government, to discharge or discriminate against any individual because of her sex, 42 U.S.C. § 2000e-16(a), or age, 29 U.S.C. § 633a. Title VII also makes it unlawful for an employer to discriminate against any individual for opposing unlawful employment practices, meaning it prohibits retaliation. 42 U.S.C. § 2000e-3(a).

A plaintiff may make out a Title VII or ADEA claim using either direct or circumstantial evidence. *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019). When analyzing claims grounded in circumstantial evidence, this Court uses the three-stage burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This approach involves "three stages at which the burden of evidentiary production is shifted back and forth between the plaintiff and defendant." *Weathersbee v. Balt. City Fire Dep't*, 970 F. Supp. 2d 418, 431 (D. Md. 2013). Although the burden of production shifts, the burden of persuasion always remains with the plaintiff. *Id.*

At the first stage of *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination. *Id.* (citing *Merritt v. Old Dominion Freight Line*, 601 F.3d 289, 294 (4th Cir. 2010)). The precise formulation of the prima facie case depends on the facts. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802 n.13). In general, a plaintiff must show "that the employer took adverse action against [her] 'under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Once the plaintiff establishes the prima facie case, the burden of production shifts to the employer

"to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 581 (D. Md. 2002) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)). If the employer meets this burden, the plaintiff must "put forth evidence that, if believed, could convince a finder of fact that the employer's purported reasons were pretextual, and that the actual basis for its employment decision was" unlawful. *Weathersbee*, 970 F. Supp. 2d at 434. Once the plaintiff offers such evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment. *Id.*

The Court does not reach the second and third stages here. On each claim, Groth fails to carry her burden at the prima facie stage. Because the NSA has carried its burden of showing that there is no genuine dispute of material fact on each claim, the NSA's motion for summary judgment will be granted.

### 1. Disparate Treatment

Groth asserts both sex and age discrimination under a theory of disparate treatment, including discriminatory discharge. To establish a prima facie claim of disparate treatment, a plaintiff must produce evidence that: (1) she belongs to a protected class; (2) "she was performing her duties in a satisfactory manner that met her employer's legitimate expectations"; (3) nonetheless, she suffered an adverse employment action (e.g., termination); and (4) the circumstances of the adverse action give rise to the inference that it was motivated by unlawful considerations. *Jones v. United Health Grp.*, Civ. No. JKB-17-3500, 2019 WL 1903668, at *7 (D. Md. Apr. 29, 2019). The Court addresses only the second element. Requiring a plaintiff to establish satisfactory performance comports with the fundamental purpose of the prima facie stage "to screen out those cases whose facts give rise to an inference of nondiscrimination, in other words, to eliminate the most common, nondiscriminatory reasons for the employer's conduct."

13

*Warch v. Ohio*, 435 F.3d 510, 514 (4th Cir. 2006). Poor performance is one such common, nondiscriminatory reason. Here, Groth has failed to show a genuine dispute of material fact that she performed satisfactorily.

A plaintiff need not show that she was a perfect or model employee to establish satisfactory performance; rather, she must show only that she was meeting her employer's legitimate expectations. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). Put another way, "a plaintiff must show that she was performing 'well enough' to dispel the possibility that she was fired for absolute or relative inadequacy." *Caban v. MET Labs., Inc.*, Civ. No. JKB-17-1872, 2019 WL 2146915, at *8 (D. Md. May 16, 2019) (quoting *Huang v. Gutierrez*, Civ. No. AW-08-2882, 2010 WL 93274, at *5 (D. Md. Jan. 5, 2010)). A court may consider evidence of what the employer's expectations were and evidence of whether the employee met those expectations. *Huang*, 2010 WL 93274, at *5.

An employer has discretion to determine its legitimate expectations for its employees. *See Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) ("It is the perception of the decision maker which is relevant."); *see Huang*, 2010 WL 93274, at *5 ("Generally, only the employer's perception of whether the employee met expectations is relevant."). The NSA expected Groth to seize tasks and produce results with no supervision. (NSA Exh. 10, 4/5/12 Tr. at 428.)

Groth's performance reviews show that she failed on this fundamental level. *Cf. Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 865 (D. Md. 2000) (holding positive overall reviews supported plaintiff's "minimal burden of showing satisfactory performance for purposes of summary judgment"). Over the course of her four years, Groth was evaluated by several supervisors, who awarded Groth lukewarm ratings. Her ACE rating fell from 3.6 out of 5 to 2.5 between September 2008 and July 2009. (NSA Exh. 21, Eval. at 262; NSA Exh. 21, 10/1/08–

14

7/31/09 ACE at 255.) During this evaluation period, Groth was removed from the Security Tools Project for failing to produce results or explain why she could not do so. (NSA Exh. 10, 4/4/12 Tr. at 227.) Groth's score rose to 2.7 in November 2009, (NSA Exh. 21, 10/1/09–11/13/09 ACE at 248), and to 3 in May 2010, (NSA Exh. 21, 11/13/09–5/31/10 ACE at 238). But, her supervisors were consistent in commenting on her failure to meet expectations or accept critical feedback.

Except for Pamela T., who praised Groth for growing her skillset, the other supervisors saw a need for improvement in each performance category. They stated that Groth was not exhibiting the technical expertise of a Grade 15 ISSE and had failed to obtain certain necessary certifications. (*See* NSA Exh. 21, 10/1/08–7/31/09 ACE at 254.) They described her poor communication skills and referred to numerous counseling sessions during which they told Groth that she needed to be more responsive. (*See* NSA Exh. 21, 11/13/09–5/31/10 ACE at 238.) They documented complaints about her performance from some government contractors. (*See* NSA Exh. 9, Memo. of Record at 43; NSA Exh. 10, 4/4/12 Tr. at 259–59.)

The fact that Groth was initially qualified for the ISSE position and hired by TS1 has little bearing on whether she performed satisfactorily. Unlike in a case claiming failure to hire or promote, where an employer claims disparate treatment or discriminatory discharge, the focus is not on an employee's qualifications but rather "on other aspects of the employment, such as poor job performance or infractions of company rules." *Warch*, 435 F.3d at 514–15. What matters is whether the employee maintained her qualifications and, more generally, met her employer's legitimate expectations. *Huang*, 2010 WL 93274, at \*5. Groth did not maintain her qualifications. She failed to pass her CISSP test, and, when the testing company accidentally mailed her a passing certificate, Groth refused to return it. (Groth Exh. 10, 9/16/14 Tr. at 62.) When the company offered her the opportunity to retake it free of charge, she refused. (Groth Exh. 10, ISC Ltr.) When

her supervisors told her that to meet expectations she needed to at least schedule another sitting of the CISSP, she did not schedule it. (NSA Exh. 22, 9/17/14 Tr. at 241.)

Groth failed to meet the NSA's expectations in general. Groth's supervisors complained that she failed to attend meetings and communicate with them. (*See* NSA Exh. 21, 11/13/09–5/31/10 ACE at 238; NSA Exh. 24, 6/1/10–1/31/11 ACE at 8.) Groth appeared to misunderstand her position, asking for engineers to work under her supervision even after her supervisors told her that she did not hold a supervisory role. (NSA Exh. 10, 4/4/12 Tr. at 227–29.) Groth also mislead her supervisors and, in the words of Carol H., attempted to bypass the chain of command within the NSA. (NSA Exh. 9, Interrogs. at 3.) When Groth was placed on a DPIP, she skipped two of the four meetings that were held on her behalf. (NSA Exh. 22, 9/17.14 Tr. at 252.) In short, Groth received feedback that her performance was lacking and specific instructions on how to improve, and yet Groth did not show so much as a willingness to improve her performance.

Groth has put forward a few emails from customers showing that they appreciated her work. (*See* Groth Exh. 4, 4/12/10 Email re Appreciation for Diane Groth; Groth Exh. 4, 4/8/10 Email re ISSE Assistance Request; Groth Exh. 4, 9/5/08 Email re meeting info; Groth Exh. IV, 1/13/12 Email re Thank you; Groth Exh. IV, 3/28/11 Email re CARILLON.) But these emails do little to dispute her overall failure to meet her *employer's* expectations year after year. Because Groth has failed to show a genuine dispute of material fact that she performed satisfactorily, Groth cannot make a prima facie case for disparate treatment.

### 2. Hostile Work Environment

The prima facie elements of a hostile work environment claim are: (1) unwelcome conduct, (2) based on a plaintiff's protected trait, (3) "which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment," and (4) which

16

is imputable to the employer. *Okoli v. Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011). Here, Groth alleged a litany of unwelcome conduct, but she fails to raise a genuine dispute of material fact as to whether that conduct was based on her sex, age, or protected activity. As such, she cannot make out a prima facie case for hostile working conditions.

A plaintiff is harassed or discriminated against based on her protected trait if, but for that trait, she would not have been the victim of harassment or discrimination. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241 (4th Cir. 2000). "'Title VII does not prohibit all verbal or physical harassment in the workplace'—it is directed only at actions that occur 'because of' one of the protected statuses." *Strothers v. City of Laurel*, 895 F.3d 317, 329 (4th Cir. 2018) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *see, e.g., EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009) (holding conduct was based on sex where coworkers repeatedly referenced her gender in a derogatory way). In terms of sexual harassment, the courts have elaborated: "A woman may prove sex-based discrimination in the workplace even though she is not subjected to sexual advances or propositions." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).

In asserting harassment, Groth alleged a list of conduct, which the Court detailed in its prior ruling. (*See* Memo. Op., ECF No. 18.) A party facing a motion for summary judgment may not rest upon the pleadings but instead must, by evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Where a genuine dispute exists, the facts and inferences derived therefrom will be viewed in the light most favorable to the non-moving party.

*Scott*, 550 U.S. at 380. Thus, the Court analyzes the list of alleged conduct in the context of the administrative record and resolves any disputes of fact in Groth's favor.

To start, some of the alleged unwelcome conduct is not specific enough—nor supported by sufficient evidence—to create a genuine factual dispute. For example, Groth alleged that she was denied the support staff which was available to her male colleagues. It is unclear what support staff she is referring to unless she means that she was not provided a team of engineers to work under her supervision. As her supervisor explained to her, Groth, like the other engineers, was not in a supervisory role. (NSA Exh. 10, 4/4/12 Tr. at 226–29.) Another allegation fails on its face. Groth alleged that she was paid less than her male colleagues despite having more advanced academic credentials than they did. Groth used two male Grade 15 engineers as comparators. The first was a higher step within Grade 15, and the higher step alone explains why he was paid more than Groth (perhaps, because he worked there longer). The second was paid slightly more than Groth, but she does not allege his pay step, so it is difficult to conclude on those bare facts that he was paid more than Groth because of her sex. Groth appears to be assuming that more education always results in greater salary, ignoring factors like experience and performance.

For some of Groth's asserted unwelcome conduct, the NSA puts forward evidence indicating that the assertion is not true. Groth asserts that she was assigned a desk among minorities, separated from all the white male engineers, but the NSA put forward evidence that Groth was assigned her desk for a number of reasons, including, the facts that she was a government employee rather than a contractor and that she had previously had the privilege of having her own office. (NSA Exh. 9, Interrogs. at 9.) Groth asserts that she was excluded from all-male meetings, but her supervisors testified that the team held either all-staff meetings or smaller meetings which included anyone that needed to participate regardless of sex. (NSA Exh.

10, 4/4/12 Tr. at 230, 234.) Groth asserts that she felt excluded in general, but Dawn H. pointed out that Groth had poor attendance at TS1 functions, came in late and left early most days, and listened to music rather than engaging in conversations around her. (NSA Exh. 20, Dawn. H. Decl. at 5.) Groth asserts that she was not allowed to keep textbooks on her desk, but the NSA puts forward evidence showing that Groth was permitted to keep textbooks on her desk; she simply was not permitted to do coursework during the work day. (NSA Exh. 9, 10/21/09 Memo. for the Record at 70–71.). It is unclear whether male ISSEs were treated the same way because they were not enrolled in courses. (NSA Exh. 9, 10/23/09 Memo. for the Record at 83.) Groth asserts that she was denied the opportunity to work on high visibility projects, but the NSA puts forward evidence showing that Groth had two high visibility projects whereas some Grade 15 employees had none. (NSA Mot., Exh. 20, Dawn H. Decl. at 2.) Groth asserts that she was not given a mentoring role over young engineers, but the NSA puts forward evidence showing that the engineers choose their mentors, and no one chose Groth. (NSA Exh. 9, Interrogs. at 9.).

Groth asserts some unwelcome conduct that did occur but occurred, not as a result of her age or gender, but as a result of her poor performance. Groth asserts that she was denied the opportunity to participate in a fellowship program in which her male colleagues could have participated. Groth's fellowship application was denied, but it was denied because Groth was new to the NSA and unable to participate in a full-time graduate program. (NSA Exh. 10, 4/4/12 Tr. at 242.) Groth's supervisor explained to her that he needed her to work full-time so that he could evaluate her work product during her probationary period. (*Id.* at 242–43.) Another supervisor agreed, testifying that she would not have supported anyone in the two-year probationary period applying to the program. (NSA Exh. 10, 4/5/12 Tr. at 467.) Because no one else in TS1 applied

19

for the program, (*id.*), there is no way to evaluate whether male ISSEs in their probationary period were allowed to apply to the program.

Groth asserts that she was removed from the women's ERG group. The NSA puts forward evidence showing that Groth was not removed from the group but was removed as its co-chair because the responsibilities were affecting her work. Bruce P. testified that he encouraged Groth to join the group but on a "non-interfering" basis because he needed her "here as much as possible to do [her] work." (NSA Exh. 10, 4/4/12 Tr. at 234–35.) At first, Bruce P. allowed her time during the work day to participate in the women's group, but, when Groth started to lose engagement with her work, he limited her to participating outside of working hours. (*Id.* at 236; NSA Exh. 9, Interrogs. at 8.) Carol H. similarly testified that Groth's leadership role in the group was impacting Groth's ability to do security engineering. (NSA Exh. 10, 4/5/12 Tr. at 438.) Carol H. asked Groth to stop participating until she improved her ACE score. (NSA Exh. 9, Interrogs. at 9.) Groth testified that, at the time she was asked to step down, she did not have enough work to do. (Groth Exh. 5, 4/4/12 Tr. at 39.) At this stage, the Court assumes that Groth is testifying accurately. Even so, Groth is only asserting that she did not have enough work, not that she was performing well.

Groth asserts that she was denied opportunities to work in other areas of the government. The NSA puts forward evidence of two instances showing that her supervisors allowed her to apply to and accept other job positions but that her poor performance kept her from attaining new employment. In December 2009, TS1 granted Groth's request for a release reassignment. (NSA Exh. 9, Interrogs. at 4.) TS1 even waived the two-year probationary requirement to allow the reassignment. Groth worked at the reassignment until April 2010, at which time her supervisor there called Carol H. to inform her that Groth was not working out and would be returned to TS1. (*Id.*) In Spring 2010, Groth again tried to transfer to another agency. (NSA Exh. 18, 10/17/10

Email re Job.) After personnel at the other agency reached out to Groth's current supervisor and another reference, they decided not to hire Groth. (NSA Exh. 19, John D. Decl. at 2.) This record reflects not only that Groth experienced these unwelcome rejections because of her job performance, but also that the rejections were not imputable to the NSA.

Groth asserts that her supervisors labeled her a poor performer, an assertion that the NSA does not deny. Groth's supervisors evaluated her work product on a regular basis and concluded that she was not meeting their expectations. Groth argues that this label was applied to her as a result of animus toward her age, sex, or EEO activity, but, without any evidence of such an animus, this argument is pure conjecture. *See, e.g., Drake v. Science Applications Int'l Corp.*, Civ. No. 17-2664, 2019 WL 1574264, at *12 (D.S.C. Mar. 4, 2019) (concluding plaintiff's claim that conduct was based on her age and/or sex was pure conjecture in part because plaintiff did not allege that anyone did or said anything that would suggest an animus to her age and/or sex).

Instead, the record shows that unwelcome conduct that did occur—the denial of her fellowship application, her removal from the women's group, her rejection from other government jobs, and her poor performance evaluations—occurred as a result of her job performance. Thus, the NSA has shown that there is no genuine dispute for a jury on the material fact of whether the unwelcome conduct was based on a protected trait. Groth cannot establish a prima facie case of harassment, and the Court need not reach the other elements of the prima facie case, nor stages two and three of *McDonnell Douglas*.

### 3. Retaliation

As with discrimination claims, "[t]he series of proofs and burdens outlined in *McDonnell Douglas* apply to retaliation claims." *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998). To establish a prima facie case of retaliation, a plaintiff must prove three elements: (1)

"that she engaged in protected activity"; (2) "that an adverse employment action was taken against her"; and (3) "that there was a causal link between the protected activity and the adverse employment action." *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004). Groth has established numerous instances of protected activity in the form of her contacts with EEOD and EEOC. The Court assumes without deciding that Groth has established some adverse actions from the list in her civil complaint. But, Groth has not carried her burden of showing that there is a genuine dispute of material fact on the third essential element: that a causal link exists between any instances of protected activity and any adverse actions.

To show a causal link between protected activity and adverse action, "the employer must have taken the adverse action *because* the plaintiff engaged in the protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998); *see, e.g., Foster v. Univ. of Md. E.-Shore*, 787 F.3d 243, 253 (4th Cir. 2015) (holding evidence sufficed to create a jury question regarding the causation prong where plaintiff presented a verbal statement of retaliatory animus and a one-month proximity between her EEO complaints and her termination). Groth has not presented any direct evidence that the NSA and its supervisors took adverse action against her *because* she lodged EEO complaints. In large part, the record reflects that her supervisors knew of the complaints starting in Fall 2009 and rarely mentioned them.

A plaintiff can establish this causal link by temporal proximity alone, but only when the proximity is "very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see, e.g., Lowman v. Md. Aviation Admin.*, 2019 WL 133267, at *8 (D. Md. Jan. 8, 2019) (holding that plaintiff alleged causation where employer discovered that plaintiff engaged in EEO activity a month before denying her a job reclassification). Where an employer considers an adverse or disciplinary action before an employee engages in protected activity, however, temporal proximity

22

between the protected activity and the action does not suffice to establish causation. *See Clark Cty. Sch. Dist.*, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Phillips v. Raytheon Applied Signal Tech., Inc.*, Civ. No. ELH-11-3230, 2013 WL 5440802, at *28 (D. Md. Sept. 27, 2013) ("There is no basis to conclude that [the] performance review was causally connected to her HR complaint because the review is largely consistent with a review plaintiff received prior to filing her HR complaint."); *see also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("Drago is unable to present a jury question regarding causation because the record evidence is overwhelming that BSO contemplated demoting him before he ever complained that BSO was interfering with his FMLA rights.").

Groth presents a series of EEO activity that is temporally intertwined with a series of purported adverse actions. A recent case from another judge in this district had similar facts. In *Thuy-Ai Nguyen v. Mnuchin*, the plaintiff engaged in EEO activity to rectify the alleged harassment and discrimination that she was facing. Civ. No. PX-18-492, 2019 WL 2270690, at *10 (D. Md. May 28, 2019). In that case, like in this case, the disciplinary action began before the plaintiff's protected activity. *Id.* After plaintiff contacted the EEO, the employer continued to discipline plaintiff, behaving consistently with its decision prior to any EEO activity. *Id.* The District of Maryland Court reasoned:

> That the EEO and disciplinary processes ran in parallel does not alter the most salient fact—that Treasury's disciplinary process began before Nguyen's EEO activity and did not become more harsh or onerous in response to Nguyen's pursuit of her EEO remedies. The mere temporal proximity between discipline and EEO contact, viewing the facts most favorably to Nguyen, is simply insufficient to sustain a retaliation claim.

23

*Id.* The administrative record here shows that Groth's performance started to fall below expectations prior to her first EEO activity in July 2009. What's more, the NSA began to take corrective and disciplinary action prior to that activity as well. As one example, the NSA removed Groth from a project for failure to produce results. The fact that the NSA continued to pursue corrective and disciplinary action does not establish causation, nor does it indicate that the action was retaliatory. Without any other evidence of causation, Groth fails to put forward sufficient evidence to give rise to a genuine dispute of material fact.

### C. Leave to File a Surreply

Groth moves for leave to file a surreply. "Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed." Local Rule 105(2)(a) (D. Md. 2019). The Court may choose to grant leave to file a surreply where new evidence or a new legal theory is raised in reply. *F.D.I.C. v. Cashion*, 720 F.3d 169, 176 (4th Cir. 2013); *see id.* ("That Cashion failed to anticipate how the FDIC would respond to his reliance on the 1099–C Form does not automatically entitle him to file a surreply."). Groth seeks to respond to certain issues that have arisen, i.e., "evidence that NSA intended not to pay [her] retirement benefits." (Mot. to File Surreply at 2, ECF No. 43.) Information regarding denial of retirement benefits would not affect the Court's decision on any of the questions currently before the Court. The other issues that Groth would like to address in surreply consist of facts the Court already has or statements of law which the Court already understands. Groth is denied leave to file a surreply on these bases.

### III. Conclusion

For the foregoing reasons, an Order shall enter denying Groth's motion for leave to file a surreply and granting the NSA's motion for summary judgment.

DATED this 18 day of July, 2019.

BY THE COURT:

*James K. Bredar*

James K. Bredar
Chief Judge